1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   JULIE MACLAY, as Personal             CASE NO. C12-512-RSM
     Representative of the Estate of Lia
11   Christine Hawkins, deceased.          ORDER ON PARTIAL SUMMARY
                                           JUDGMENT MOTIONS
12                    Plaintiff,

13   LUNDE MARINE ELECTRONICS,
     INC.,
14            Plaintiff in Intervention,

15            v.

16   M/V SAHARA, IMO No. 6600826, her
     engines, tackle, rigging, equipment and
17   other appurtenances, in rem; and G
     SHIPPING LTD.,
18
                     Defendants.
19

20        This matter comes before the Court on Plaintiff's motion for partial summary judgment

21   (Dkt. # 69), and Defendants' motion for partial summary judgment (Dkt. # 71). Plaintiff brought

22   this maritime survival and wrongful death suit against the M/V SAHARA and G Shipping after

23   the death of her daughter, Lia Hawkins. Ms. Hawkins was an employee of G Shipping, the owner

24

ORDER ON PARTIAL SUMMARY JUDGMENT MOTIONS - 1

of the M/V SAHARA (the Vessel). The Vessel is a former oceanographic research vessel that G

Shipping purchased for conversion into a luxury floating hotel. Plaintiff alleges that Ms.

Hawkins died after falling from the Vessel. Plaintiff now moves for summary judgment on Ms.

Hawkins' maritime worker status; the mode, manner, and cause of her death; and moves to strike

Defendants' affirmative defenses. Defendants move for a summary judgment determination that

Ms. Hawkins' family members are barred from recovering loss-of-society damages under

applicable law. For the reasons stated below, Plaintiff's motion is GRANTED in PART and

DENIED in PART, and Defendants' motion is GRANTED in PART and DENIED in PART.

## BACKGROUND

G Shipping is a foreign corporation organized under the laws of Malta. Its principal,

Emanuele Garosci, is an Italian national and developer and designer of luxury hotels. Mr.

Garosci acquired ownership of the 300-foot, former research Vessel in 2009, intending to

convert it to a luxury floating hotel. He hired Ms. Hawkins and a handful of other individuals to

pursue the conversion project. Ms. Hawkins was initially hired to perform clerical and

administrative duties shore-side, but her office was moved onto the Vessel a short time later. Ms.

Hawkins routinely engaged in general labor to assist in the conversion process. She engaged in

heavy cleaning and disposing of scrap metal. Plaintiff contends that roughly fifty percent of Ms.

Hawkins' daily activities concerned general labor.

On October 21, 2010, Ms. Hawkins disappeared from the Vessel. The next day, divers

discovered her body under the adjacent dock. She was clothed in work coveralls and had a work

glove on one hand. Plaintiff contends that Ms. Hawkins was throwing scrap metal off of an

unprotected area of the Vessel's upper deck when she fell, hit her head, and then drowned a

conscious death.

1     At the time of Lia's death, the conversion project was substantially incomplete. The

2   Vessel had not received stability letters nor had it been classed by a society. Millions of dollars

3   worth of work remained to be conducted before the Vessel could be returned to service.

4     Plaintiff Julie MacLay, Lia's mother, filed suit on behalf of Lia's estate to foreclose a

5   preferred maritime tort lien against the Vessel *in rem*, and against both the Vessel and G

6   Shipping for compensatory and punitive damages. The Court granted Plaintiff's motion to arrest

7   the vessel and appointed a substitute custodian on March 26, 2012. Dkt. ## 6, 7. On October 17,

8   2012, the Court granted three discovery-related motions made by Plaintiff and sanctioned G

9   Shipping for discovery-related abuse. Dkt. # 48. Trial is set for April 8, 2013.

## DISCUSSION

11   **A.  Legal Standard**

12     Summary judgment is appropriate where "the movant shows that there is no genuine

13   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

14   R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   In ruling on

15   summary judgment, a court does not weigh evidence to determine the truth of the matter, but

16   "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d

17   547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d

18   744, 747 (9th Cir. 1992)).  Material facts are those which might affect the outcome of the suit

19   under governing law. *Anderson,* 477 U.S. at 248.

20     The Court must draw all reasonable inferences in favor of the non-moving party. *See*

21   *O'Melveny & Meyers*, 969 F.at 747, *rev'd on other grounds*, 512 U.S. 79 (1994).  However, the

22   nonmoving party must make a "sufficient showing on an essential element of her case with

23

24

ORDER ON PARTIAL SUMMARY JUDGMENT MOTIONS - 3

respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

**B. Plaintiff's Motion for Partial Summary Judgment**

Plaintiff moves for summary judgment on Ms. Hawkins' maritime worker status; the mode, manner, and cause of her death; and moves to strike Defendants' affirmative defenses. The Court addresses each issue in turn.

1. <u>Ms. Hawkins' Maritime Worker Status</u>

Plaintiff seeks a determination on summary judgment that Lia Hawkins was a harbor worker covered under the United States Longshore & Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq., and not a "seaman" under the Jones Act. Defendant, however, contends she was a Jones Act seaman. The Jones Act provides a remedy for any "seaman" injured "in the course of his employment." 46 U.S.C. § 688. Seaman status is a mixed question of law and fact, but summary judgment is appropriate if the facts and law support only one conclusion. *Delange v. Dutra Const. Co., Inc.*, 183 F.3d 916, 919 (9th Cir. 1999).

A plaintiff has seaman status if (1) his duties contribute to the function of the vessel or the accomplishment of its mission, and (2) he has a connection to a vessel *in navigation* that is substantial both in duration and nature. *Id.* (citations omitted) (emphasis added). Both prongs must be satisfied to support a finding of seaman status. Here, the dispositive issue is whether the M/V SAHARA was a vessel "in navigation" at the time of Lia's death. In *McKinley v. All Alaskan Sea Foods, Inc.*, the court held that a ship idled for major repairs and unusable for its intended purpose is not "in navigation." 980 F.2d 567, 571-72 (9th Cir. 1992). There, the vessel was undergoing an extensive conversion from an oil drill ship to a seagoing fish and crab processing ship when Mr. McKinley was killed in a fire. Although the vessel had undergone stability testing, it was never granted a stability letter. Thus, the vessel was "not seaworthy at the

time of [his] death." *Id.* at 569. In upholding the district court's grant of summary judgment, the court discussed three factors relevant to whether the vessel was "in navigation." First, courts evaluate the purpose for which the vessel has been idled. Second, courts may consider the status of the vessel and the work to be completed. Last, courts may look to the extent of the repairs and who controls them. The court also noted that control of the vessel is not dispositive when the "work is so extensive as to constitute conversion." *Id.* at 571. It determined that although the vessel remained under the control of its owner, the vessel was not in navigation because it was undergoing a substantial conversion project and was not in commerce for its new intended use at the time of McKinley's death. *Id.*

Here, the Vessel was not in navigation at the time of Lia's death. It is undisputed that the Vessel was undergoing a major conversion from a scientific research vessel to a luxury floating hotel. Although several elements of the Phase One conversion were completed, none of the Phase Two work had been initiated. *See* Dkt. # 59-4, pp. 9-12.  It is undisputed that the Vessel never endured stability trials, nor was it granted a stability letter, nor was it classed by a vessel classification society. Dkt. # 59-6, pp. 16, 18. Plaintiff supplied uncontroverted evidence concerning the nature and extent of repairs necessary to convert the ship to its new intended purpose, the majority of which remained substantially incomplete at the time of Lia's death. *See* Dkt. # 59-4, pp. 9-12. Moreover, it is undisputed that the Vessel was not in a condition to be used in commerce as a luxury floating hotel. Dkt. # 59-6, p. 17. In sum, Defendants fail to rebut Plaintiff's evidentiary showing that the ship was undergoing a major conversion from a decommissioned research vessel to a luxury hotel; that the vessel was not seaworthy because it had not received stability letters or been classed; and that although in the control of G Shipping, the Vessel's intensive conversion project remained substantially incomplete. Each of the factors

1   discussed in *McKinley* favor Plaintiff's argument that the Vessel was not in navigation. Because

2   Defendants fail to satisfy the in navigation requirement, Ms. Hawkins was not a Jones Act

3   seaman.

4          The Court next addresses whether Ms. Hawkins was a harbor worker under the LHWCA.

5   The LHWCA provides compensation for the disability or death of non-seamen maritime

6   employees. *Coloma v. Director, OWCP*, 897 F.2d 394, 397 (9th Cir. 1990). The act covers

7   claimants who satisfy both a geographic "situs" test and an occupational "status" test. *See*

8   *Chesapeake & Ohio R.R. Co. v. Schwalb*, 493 U.S. 40, 45 (1989); *Coloma*, 897 F.2d at 397-98.

9   Geographic situs is met when the employee's injury occurred "upon the navigable waters of the

10  United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine

11  railway, or other adjoining area customarily used by an employer in loading, unloading,

12  repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a). The occupational status test is

13  met when the injured employee is a "person engaged in maritime employment, including any

14  longshoreman or other person engaged in longshoring operations, and any harbor-worker

15  including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902. However, the

16  definition of "maritime employee" excludes "individuals employed exclusively to perform office

17  clerical, secretarial, security, or data processing work," and "a master or member of a crew of

18  any vessel." 33 U.S.C. § 902(3)(A) & (G).

19         Here, Ms. Hawkins meets both the situs and status tests required for coverage under the

20  LHWCA. As to geographic situs, the Vessel was moored at the Ballard Mill Marina, upon

21

22

23

24

navigable waters, within the territorial waters of the State of Washington.[1] Ms. Hawkins' death

occurred during her employment on the moored vessel, and her body was recovered from the

water under the adjacent dock. The situs test is accordingly met. The status test is also met.

Although G Shipping contends that Ms. Hawkins was hired exclusively to work aboard the ship

"as its pursor" and "for no other reason," no employment contract was produced to support such

statements. Conversely, Plaintiff presents uncontroverted evidence that Ms. Hawkins routinely

engaged in the cleaning and demolition of areas of the Vessel. Dkt. # 59-4, pp. 22-27; Dkt. # 59-

6, pp. 2-4; 7-9. The terms "ship repair" and "ship repairing" mean "any repair of a vessel

including, but not restricted to, alterations, conversions, installations, cleaning, painting, and

maintenance work." 29 C.F.R. § 1915.4(j).  Thus, the definition of ship repair includes the work

performed by Ms. Hawkins on a regular basis. Defendants fail to show that her duties were

solely administrative or clerical to fall under the administrative exclusion to § 902(3). Nor have

Defendants shown that Ms. Hawkins falls into the "crew member" exclusion. A "crew member,"

as opposed to a harbor worker, is a worker aboard a ship for the primary purpose of aiding in

navigation. *Pac. Emp. Ins. Co. v. Pillsbury*, 130 F.2d 21, 24 (9th Cir. 1942). As discussed above,

the Vessel was not in navigation at the time of Ms. Hawkins' death. Because the Vessel was not

in navigation, Ms. Hawkins was not a crew member.  *See Carumbo v. Cape Cod S. S. Co.*, 123

F.2d 991, 995 (1st Cir. 1941) ("One cannot be a 'member of a crew' if the ship is not in

navigation."). Ms. Hawkins is accordingly entitled to coverage under the LHWCA.

The parties do not dispute that G Shipping failed to purchase the compensation coverage

required by the LHWCA under § 904(a). Dkt. # 59-6, p. 13. Should an employer fail to purchase

---

[1] Defendant argues that the Death on the High Seas Act ("DOHSA") may apply. To be on the "high seas," a vessel must be three miles from the shoreline. Here, the Vessel was moored in the Ballard Mill Marina. Accordingly, that act cannot apply.

coverage, § 905(a) permits the legal representative of the decedent to "maintain an action at law or in admiralty for damages on account of such injury or death." 33 U.S.C. § 905(a). The Court finds the LHWCA applicable to Ms. Hawkins, and that G Shipping failed to procure the necessary compensation coverage. Accordingly, Plaintiff's claims may be maintained under § 905(a). Plaintiff's motion is GRANTED on this issue.

2.   Mode, Manner, and Cause of Ms. Hawkins' Death

Plaintiff asks the Court to grant summary judgment on the facts of Ms. Hawkins' death. She seeks not only a finding by the Court as to the legal effect of the death certificate, which established the manner (or mode) and cause of death, but also factual findings surrounding what happened to Ms. Hawkins when she died. Plaintiff's motion is untethered to a motion for summary judgment on liability. Although summary judgment may be used as a tool to narrow the real issues in dispute, this request is improper. The Court declines to weigh the evidence and evaluate witness credibility to establish, as a matter of law, facts that are favorable to Plaintiff's case theory. Such determinations are the province of the jury. To the extent Plaintiff asks the Court to take judicial notice of the death certificate, this request is granted. The Court takes judicial notice of the mode/manner of Ms. Hawkins' death as "accident," and the cause of death as "drowning and skull fracture due to blunt force head injury." Dkt. # 63-1, p. 7; RCW 70.58.180.

3.   Motion to Strike Affirmative Defenses

Plaintiff moves to strike each of Defendants' affirmative defenses, or asks the Court to dismiss them as a matter of law. Dkt. # 69, p. 23. Under Fed. R. Civ. P. 12(f), "the court may strike from a pleading an insufficient defense." Motions to strike affirmative defenses are generally disfavored, but the court may strike defenses that fail to comply with the pleading

requirements of Fed. R. Civ. P. 8(a) or are redundant of matters raised in the defendant's denial. *Reynolds v. S.R.G. Restaurant Group*, 119 F. Supp. 2d 800, 802 (N.D. Ill. 2000). Furthermore, affirmative defenses must meet the standards of Fed. R. Civ. P. 12(b)(6). Thus, when viewed in the light most favorable to the pleader, if the affirmative defense fails to state a claim upon which relief can be granted, it shall be dismissed. *Id.*

As an initial matter, Defendants agree to withdraw Affirmative Defenses 3, 14, 15, and 17. Accordingly, these defenses are STRICKEN. In addition, Plaintiff did not address Affirmative Defense 9. Defense 9 will be permitted.

With respect to the remaining thirteen defenses, Defendants concede that Affirmative Defenses 4, 5, 6, 7, and 8 are legally insufficient based on the Court's finding that 33 U.S.C. § 905(a) applies in this case.[2] Dkt. # 73, p. 15. Thus, these defenses are STRICKEN for failure to state a claim. This leaves only Affirmative Defenses 1, 2, 10, 11, 12, 13, and 16. Defendants offer no response to Plaintiff's request to strike Defense 1. Affirmative Defense 1 states: "Plaintiff has failed to state to state a claim for which relief can be granted." Dkt. # 29, p. 4. Defendants have not challenged Plaintiff's claims under Fed. R. Civ. P. 12(b)(6) nor has it responded to Plaintiff's request to strike. Therefore, Affirmative Defense 1 is STRICKEN for failure to state a claim.

Plaintiff contends that Affirmative Defenses 2 and 12 are not affirmative defenses because they are improper attempts to rebut Plaintiff's *prima facie* case. Defendants contend each is properly asserted by stating only that "they fall outside of rebutting the allegations of

---

[2] If an employer fails to secure payment of compensation coverage under the LHWCA, section 905(a) bars employers from pleading as a defense (1) that the injury was caused by the negligence of a fellow servant; (2) that the employee assumed the risk of employment; or (3) that the injury was due to the employee's contributory negligence. 33 U.S.C. 905(a).

1   plaintiff's prima facie case." Dkt. # 73, p. 15. "An affirmative defense raises matters extraneous

2   to the plaintiff's *prima facie* case; as such, they are derived from the common law plea of

3   'confession and avoidance.'" *Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 546 (6th Cir.

4   1986) (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1270, at 289 (1969)).

5   Affirmative defenses generally do not include defenses that negate an element of a plaintiff's

6   *prima facie* case. *Id.* (citing 2A J. Moore & J. Lucas, Moore's Federal Practice ¶¶ 8.27[1],

7   8.27[4] (2d ed. 1985)). The line between the two types of defenses, however, may not be clear.

8   *Id.* But, "if permitting the defendant to interpose the defense will force the plaintiff to perform

9   additional discovery or develop new legal theories, these considerations will militate heavily in

10  favor of terming the defense affirmative." *Id.*

11      Affirmative Defense 2 states: "OSHA in its investigation of Ms. Hawkins death found no

12  safety violations aboard the vessel or with G Shipping's operations and procedures." Dkt. # 29,

13  p. 4. Although Defense 2 could support an inference that G Shipping denies liability, it also

14  raises additional facts that are absent from Plaintiff's complaint. The Defense does not assert the

15  effect of OSHA's investigation, but it puts Plaintiff on notice that she should address the effect

16  of the investigation on her claims. Fairness weighs in favor of characterizing Defense 2 as an

17  affirmative defense. Accordingly, the Court finds Defense 2 properly asserted.

18      Affirmative Defense 12 states: "This defendant as owner and operator of the vessel M/V

19  SAHARA, carefully and thoroughly screened all of its crew for compliance, dutifully and fully

20  maintained its vessel to all applicable standards and did all that is required under the law to make

21  said vessel fit for its intended voyage; as a result thereof, defendant has breached no obligation to

22  plaintiff under applicable law and is therefore not liable." Dkt. # 29, p. 5. Unlike Defense 2, this

23  Defense rebuts the elements of Plaintiff's *prima facie* case and is an improper affirmative

24

1    defense. Moreover, Defendants denied ¶¶ 25 and 30 of the Verified Complaint, paragraphs that

2    address Defendants' liability. Defense 12 adds no additional information beyond Defendants'

3    general denial of Plaintiff's allegations. The Court STRIKES Affirmative Defense 12 as

4    redundant.

5         Plaintiff challenges Affirmative Defense 10, which states: "Defendant has fully

6    discharged its obligations to the plaintiff-decedent for payment of funeral expenses and wages to

7    the end of the voyage." Plaintiff contends that G Shipping has not discharged its payment

8    obligations because she is entitled to damages beyond payment of funeral expenses and earned

9    wages. The defense, however, does not state that such payment is Plaintiff's only remedy and

10   introduces additional factual information. The Court declines to strike Affirmative Defense 10.

11        Plaintiff challenges Affirmative Defense 11, failure to mitigate damages, on the basis that

12   Ms. Hawkins' injury was fatal, and thus afforded no opportunity to mitigate loss. Defendants

13   respond that the mitigation of damages defense does not target Plaintiff's tort remedies; rather,

14   the defense targets the "unnecessary and expensive" damages incurred by arresting the Vessel.

15   Plaintiff filed a verified complaint against the Vessel *in rem* and a motion to arrest the Vessel to

16   enforce a maritime tort lien. The Court granted that motion and Defendants did not challenge the

17   legal sufficiency of the Order. Because the Court granted Plaintiff's motion to arrest the Vessel,

18   Affirmative Defense 11 is STRICKEN as moot.

19        Plaintiff next contests Affirmative Defense 13 as improper because it raises a choice of

20   law issue. The defense states: "The claims plaintiff has asserted are encompassed by the general

21   maritime law and statutory federal maritime law of the United States, and to the extent that the

22   aforesaid maritime law conflicts with any other jurisdiction's legal tenets, it supersedes it." Dkt.

23

24

1  # 29, p. 5. Plaintiff fails to show that this defense is improper merely because it contemplates the

2  governing law in this case. Accordingly, the Court declines to strike Defense 13.

3  Last, Plaintiff challenges Affirmative Defense 16 on the basis that no employment

4  contract was produced during discovery. The defense states: "The rights and liabilities as

5  between the parties are governed by the employment contract between plaintiff-decedent and

6  defendant as memorialized in the shipping articles signed by both plaintiff and defendant." Dkt.

7  # 29, p. 6. Defendants respond that although no hard-copy of the document has been found, an

8  implied contract exists. However, the affirmative defense specifically refers to an employment

9  contract memorialized in the shipping articles, not an implied contract. Because Defendants

10  concede that no contract was produced in this case, the defense is STRICKEN for failure to state

11  a claim.

12  4.  G Shipping's Request to Strike the Cummins and Williams Declarations

13  G Shipping contends that the Cummins declaration is improper because the expert report

14  it references was unsigned, and that the Williams declaration should be stricken because Dr.

15  Williams was not properly disclosed during discovery, to Defendants' detriment. The Court need

16  not evaluate the merits of these arguments because it declined to grant summary judgment on

17  Plaintiff's "Mode, Manner, and Cause of Death" contentions, to which the Cummins and

18  Williams declarations pertain. G Shipping's request to strike is therefore MOOT.

19  5.  G Shipping's Cross Motion for Partial Summary Judgment

20  Under Local Civil Rule 7(k), "[a] party filing a cross motion must note it in accordance

21  with local rules." Moreover, parties contemplating filing cross motions "are encouraged to agree

22  on a briefing schedule and to submit it to the court for approval through a stipulation and

23  proposed order." *Id.* Here, Defendants filed a Response brief to Plaintiff's motion for partial

24  summary judgment that includes a request to grant summary judgment in favor of Defendants,

ORDER ON PARTIAL SUMMARY JUDGMENT MOTIONS - 12

but Defendants did not properly file the brief as a cross motion for partial summary judgment or note it accordingly. Dkt. # 73, p. 15. As Defendants' cross motion failed to comply with the local rules, it shall be DENIED.

**C.  Defendants' Motion for Partial Summary Judgment**

G Shipping and the Vessel, *in rem*, move for partial summary judgment to dismiss Plaintiff's claim for non-pecuniary damages. In the Verified Complaint, Plaintiff asserts a maritime wrongful death damages claim on behalf of Ms. Hawkins' parents and siblings for their loss of society with the decedent.  Defendants contend that (1) loss-of-society damages are unavailable under general maritime law, and (2) even if loss-of-society claims are generally permissible, claims benefitting Ms. Hawkins' parents and siblings are precluded because none were dependants of Ms. Hawkins. The Court first addresses whether the relevant law permits recovery for loss of society, and then turns to whether loss-of-society claims require that the beneficiary be a dependant of the decedent.

    1.  Loss of Society

The Court determined that Ms. Hawkins was a harbor worker under the LHWCA. As discussed above, the Jones Act does not apply because the Vessel was never in navigation as required by the Act. Nor does the Death on the High Seas Act ("DOHSA") apply in this case as the Vessel was moored in the territorial waters of Washington State. The Court also determined that 33 U.S.C. § 905(a) governs. Section 905(a) permits a LHWCA plaintiff to bring suit in law or admiralty without concern for the limitation of remedies imposed by the Act. Plaintiff chose to bring suit under the general maritime law for survival and wrongful death. She does not assert any claims under state law.

Defendants contend that loss-of-society damages are not available under general maritime law for wrongful death. The Supreme Court first recognized a right of recovery for

1    wrongful death under general maritime law in *Moragne v. States Marine Lines*, 398 U.S. 375

2    (1970). While *Moragne* established the cause of action, it left to other federal courts the task of

3    defining the nature of damages. *Id.* at 408. In *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573

4    (1974), the Supreme Court confronted the damages issue and held that *Moragne* plaintiffs, as

5    beneficiaries for the wrongful death of a longshoreman, could recover both pecuniary and loss-

6    of-society damages[3] under general maritime law. The Supreme Court then cabined *Gaudet* by

7    limiting its application to longshoremen who died in state territorial waters. *Miles v. Apex*

8    *Marine Corp.*, 498 U.S. 19 (1990). The Ninth Circuit, however, held that while *Miles* restricted

9    the reach of *Gaudet*, it permitted loss-of-society damages for wrongful death claims asserted by

10   beneficiaries of non-seamen in territorial waters. *Sutton v. Earles*, 26 F.3d 903 (9th Cir. 1994).

11   Thus, in the Ninth Circuit, whether loss-of-society damages for maritime wrongful death are

12   recoverable depends on whether statutory or general maritime law applies. Although neither the

13   Jones Act nor DOHSA permit loss-of-society damages, *Sutton* makes clear that beneficiaries of

14   non-seamen in territorial waters may nonetheless recover for loss of society under general

15   maritime law. Therefore, under *Sutton*, loss-of-society damages are recoverable because Ms.

16   Hawkins was a non-seaman who died in the territorial waters of Washington State.

17       2.   Dependency

18       *Sutton* also held that non-dependent parents may recover loss-of-society damages as

19   beneficiaries of the decedent. *Id.* at 916 ("Parents, dependent or not, are therefore entitled to loss-

20   of-society damages). Contrary to *Sutton*, Defendants contend that Washington's wrongful death

21   statute, RCW 4.20 et seq., applies and that RCW 4.20.020 limits wrongful death beneficiaries to

22   _____

23       [3] Loss of society encompasses "a broad range of mutual benefits each family member
     receives from the others' continued existence, including love, affection, care, attention,

24   companionship, comfort, and protection." *Gaudet*, 414 U.S. 573, 585 (1974).

1   dependent parents and siblings of the decedent. Notwithstanding that Plaintiff brought claims

2   under general maritime law and Defendants affirmatively pleaded for application of maritime

3   law in their Answer and Amended Answer, Washington's wrongful death statute does not limit

4   the general maritime law. Although state wrongful death remedies may be applied to enlarge the

5   range of recoverable damages available, Defendants have not shown that, in this Circuit, such

6   statutes limit the nature of damages otherwise available under federal maritime law. In *Yamaha*

7   *Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 1999 (2001), the Supreme Court held that state

8   remedies may supplement the general maritime law to enlarge damages; it did not hold that state

9   remedies supplant the general maritime law when state law remedies otherwise limit the extent

10   of recovery. *See id.* at n. 8 ("We attempt no grand synthesis or reconciliation of our precedent

11   today, but confine our inquiry to the modest question whether it was *Moragne's* design to

12   terminate recourse to state remedies when nonseafarers meet death in territorial waters."); *see*

13   *also Bratelli et al. v. United States*, Case No. J95-003 CV (JWS), 1996 A.M.C. 1980, 1984-85

14   (D. Alaska May 16, 1996) (interpreting *Yamaha* and rejecting argument that state law remedies

15   displace general maritime remedies in state territorial waters). Although the Washington statute

16   does not permit loss-of-society damages for non-dependent parents, *Sutton* expressly holds that

17   such damages are permitted under general maritime law. Accordingly, Ms. Hawkins' parents

18   may maintain a claim for loss-of-society damages.

19        For Ms. Hawkins' siblings, however, *Sutton* is silent. Defendants contend that Ms.

20   Hawkins' siblings were not her dependents and may not recover loss-of-society damages.

21   Defendants provided deposition testimony from Ms. Hawkins' twin brother, Theron, stating that

22   he was not a financial dependent of his sister. Dkt. # 72-3, p. 31. Plaintiff offered no factual

23   evidence rebutting the non-dependent status of Ms. Hawkins' siblings. While Ms. Hawkins' non-

24

1  dependent parents may recover loss-of-society damages under *Sutton*, the *Sutton* court's

2  reasoning informs whether recovery should be available to non-dependent siblings.  Discussing

3  *Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084 (2nd Cir. 1993) the court stated:

> In *Wahlstrom,* the court first ruled that the district court erred in adopting a parental dependency requirement for *any* type of recovery in *Moragne* actions. 4 F.3d at 1090–91. In rejecting the district court's blanket dependency requirement, the court relied upon the DOHSA schedule of beneficiaries found at 46 U.S.C.App. § 761. *Id.* (noting *Moragne* 's admonition that lower courts use DOHSA as a guide in fashioning the newly established general maritime wrongful death cause of action). The court stated that DOHSA's authorization of suits "'for the exclusive benefit of the decedent's wife, husband, parent, child or dependent relative' ... indicat[es] that a parent need not be a dependent of the decedent to have standing to recover some damages." *Id.* at 1090.
>
> With this reasoning, we agree.[15] Indeed, we would stop there because: (1) *Gaudet* instructs that loss-of-society damages are available for *Moragne* wrongful death actions not covered by either DOHSA or the Jones Act; (2) **Federal courts typically rely upon the DOHSA schedule of plaintiffs in determining standing to bring a *Moragne* wrongful death action.** Parents, dependent or not, are therefore entitled to loss-of-society damages.

*Id.* (emphasis added).

The *Sutton* court relied on the DOHSA schedule of plaintiffs to determine that

dependency is not required for parents. DOHSA's schedule limits a right of action for wrongful

death to the "decedent's wife, husband, parent, child, or dependent relative." 46 U.S.C. § 761.

Facially, DOHSA does not require dependency status for parents, but it does require dependency

for siblings as a class of non-specified "dependent relatives." While discussion of the DOHSA

schedule is absent from the parties' briefing, the Court found two cases specifically addressing

whether non-dependent siblings may maintain a wrongful death cause of action under general

maritime law. In *Glod v. Amercian President Lines, Ltd.*, 547 F. Supp. 183 (N.D. Cal. 1982), the

court looked to DOHSA's schedule of beneficiaries to determine which family members may

maintain a cause of action. *Id.* at 185. In light of DOHSA, the court found that the decedent's

non-dependent siblings were not entitled to maintain an action for maritime wrongful death. *Glod*, 457 F. Supp. at 186. Similarly, in *Evich v. Connelly*, 759 F.2d 1432 (9th Cir. 1985), the court held that non-dependent brothers of the decedent could not maintain an action for maritime wrongful death after consideration of both DOHSA and the Alaska wrongful death statute. *Id.* at 1434 ("Recovery for maritime wrongful death would require Connelly's brothers to be dependent relatives."). As discussed by both *Glod* and *Evich*, the DOHSA schedule does not permit recovery by non-dependent siblings. Because Plaintiff failed to show that Ms. Hawkins' siblings were dependent relatives, they are improper beneficiaries for maritime wrongful death and may not recover loss-of-society damages. Accordingly, partial summary judgment is GRANTED in PART and DENIED in PART.

## CONCLUSION

Having reviewed the motions, the responses and replies thereto, all attached exhibits and declarations, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiff's motion for partial summary judgment (Dkt. # 69) is GRANTED in PART and DENIED in PART;

(2) Affirmative Defenses 1, 3, 4, 5, 6, 7, 8, 11, 12, 14, 15, 16, and 17 are STRICKEN;

(3) Defendant G Shipping's request to strike is MOOT;

(4) Defendants' cross-motion for partial summary judgment is DENIED for failure to comply with the local rules;

(5) Defendants' motion for partial summary judgment (Dkt. # 71) is GRANTED in PART and DENIED in PART;

The Clerk is directed to send this Order to all counsel of record.

1    Dated this 22nd day of February 2013.

2

3

4    _____
     RICARDO S. MARTINEZ
5    UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON PARTIAL SUMMARY JUDGMENT MOTIONS - 18